# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7463 | **DATE** | 4/26/2001 |
| **CASE TITLE** | *00 C 7933* | Cogniplex, Inc. et al vs. Hubbard Ross, L.L.C. et al (00 C 7463) Hubbard Decision Research v. Hubbard Ross (00 C 7464) Arns et al -v- Hubbard et al (00 C 7933) | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ■  Status hearing set for 8/27/2001 at 9:30 A.M..

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  Ruling held. **ENTER MEMORANDUM OPINION:** Defendants' motions (Doc 24-1 in 00 C 7463 and Doc 17-1 in 00 C 7933) are granted in part and denied in part. Discovery cut-off date in all 3 cases, set for August 27, 2001.

(11)  ■  [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | APR 2 7 2001 | |
| ✓ | Docketing to mail notices. | | date docketed | 21 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| SCT | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COGNIPLEX, INC., DOUGLAS HUBBARD )
and DHS & ASSOCIATES, INC., )
)
Plaintiffs, )
)
vs. )                          00 C 7463
)
HUBBARD ROSS, L.L.C., JACK ROSS and )
KATHLEEN FILBIN ARNS, )
)
Defendants. )
)
_____ )
)
KATHLEEN FILBIN ARNS, JACK ROSS )
and HUBBARD ROSS, LLC, )
)
Plaintiffs, )
)
vs. )                          00 C 7933
)
DOUGLAS HUBBARD, COGNIPLEX, INC., )
an Illinois corporation, and HUBBARD )
DECISION RESEARCH, INC., an assumed )
Illinois business corporate name of )
COGNIPLEX, INC., )
)
Defendants. )



DOCKETED APR 27 2001

## **MEMORANDUM OPINION**

CHARLES P. KOCORAS, District Judge:

Before the Court are two motions to dismiss in the related cases <u>Cogniplex, Inc.</u>

<u>v. Hubbard Ross, L.L.C.</u> (00 C 7463) and <u>Arns v. Hubbard</u> (00 C 7933).  In the first

case, Defendants have moved to dismiss Counts I, II, III and IV of the Amended Complaint. In the second case, Defendants have moved to dismiss Counts I, II, III, IV, V and VIII of the Complaint. For the following reasons, we grant each motion in part and deny each in part.

These cases arise from the formation of a limited liability company ("LLC") by Douglas Hubbard ("Hubbard"), Jack Ross ("Ross") and Kathleen Arns ("Arns"). Hubbard and two companies brought an action against Ross, Arns and the LLC seeking declaratory judgment of copyright ownership, rescission and commercial disparagement (the "Hubbard Action"). In turn, Arns and Ross have sued Hubbard and two companies alleging securities violations, breaches of fiduciary duties, breach of contract, conversion, and common law fraud (the "Arns Action"). In order to fulfill our obligation to accept each side's allegation of facts as true, and for the sake of clarity, we treat each of the cases separately below.

## I. THE HUBBARD ACTION

### A. BACKGROUND

Hubbard worked for DHS & Associates, Inc. ("DHS") as Director of Applied Information on Economics from 1995 until January 29, 1999. In this capacity, he was responsible for developing and marketing software programs, methods and related materials to perform quantitative analysis of information technology investments for

clients of DHS. During his employment with DHS, Hubbard and co-workers developed and produced certain programs and methods described in written materials. These materials, dubbed the "AIE Documents" or "AIE Methodology," were authored by Hubbard and others in their capacity as employees of DHS or its clients. Upon leaving DHS in January 1999, Hubbard received oral permission and license from DHS to use the AIE Documents in his subsequent employment.

On March 26, 1999, Hubbard formed with Arns and Ross a limited liability company called Hubbard Ross L.L.C. ("HRLLC"). The company offered economic consulting services to clients considering large dollar purchases of information technology programs and equipment. Prior to forming the company, on March 13, 1999, Hubbard, Arns and Ross each signed an agreement entitled "Buyout Agreement of Applied Information Economics Assets of Doug Hubbard by Jack Ross and Kathleen Filbin Arns" (the "Buyout Agreement"). At the time of signing the Buyout Agreement, all three parties believed that Hubbard had an ownership interest in the AIE Documents. Hubbard now believes, however, that the AIE Documents constituted "works for hire" and were and are the intellectual property of DHS. As "works for hire," claims Hubbard, the AIE Documents could not be transferred from DHS to Hubbard through a verbal license.

Also prior to forming the company, Arns prepared a copyright application for a group of materials generally titled "Applied Information Economics" ("AIE"). Arns presented the application to Hubbard for his signature which he provided. Arns signed the application, too, and submitted it for copyright to the United States Copyright Office. Hubbard maintains that those materials are copies in whole or part of the AIE Documents.

Over the ensuing year, business relations among Hubbard, Arns and Ross began to deteriorate. By August 21, 2000, Hubbard had "disassociated" himself from HRLLC. After Hubbard disassociated himself, Cogniplex, Inc. ("Cogniplex") obtained from DHS a written license to use the AIE Documents. Hubbard and DHS have notified Ross, Arns and HRLLC of the error in the understanding of Hubbard's purported ownership. Notwithstanding this notice, Ross, Arns and HRLLC have allegedly continued to assert copyright ownership in the AIE Documents, use the Documents, and represent to third parties their exclusive right to use and profit from the Documents. At least one such incident purportedly occurred sometime between October 1 and 10, 2000, when Ross and HRLLC, acting by and through its agent Anne Keays, told representatives of the Meta Group that HRLLC alone owned the AIE Methodology and that Hubbard and Cogniplex lacked any license to distribute, market or use the AIE Methodology. In addition, Ross, Arns and HRLLC have allegedly

refiled their original copyright application to correct and perfect it and have interfered with the efforts of Hubbard and Cogniplex to obtain new employment utilizing the AIE Documents pursuant to Cogniplex's written license.

Cogniplex, Hubbard and DHS (the "Copyright Plaintiffs") filed a seven-count Complaint against HRLLC, Arns and Ross (the "Copyright Defendants") on March 26, 2001. In Count I, all of the Copyright Plaintiffs seek a declaratory judgment of the copyright ownership. In Count II, Hubbard asks for rescission of the Buyout Agreement. Count III alleges on behalf of Cogniplex and Hubbard violation of the Illinois Uniform Deceptive Trade Practices Act, while Count IV raises a common law claim of commercial disparagement. Count V asserts slander per se on behalf of Hubbard. Finally, Counts VI and VII allege breach of contract on behalf of Cogniplex.

## B. LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests whether the plaintiff has properly stated a claim for which relief may be granted. Pickrel v. City of Springfield, Ill., 45 F.3d 1115, 1118 (7th Cir. 1995). The court must accept as true all of the plaintiff's well-pleaded factual allegations as well as all reasonable inferences. Coates v. Illinois State Bd. of Ed., 559 F.2d 445, 447 (7th Cir. 1977). However, the court need "not strain to find inferences favorable to the plaintiffs" which are not apparent on the face of the complaint. Id. The court will dismiss a complaint under Rule 12(b)(6) only

if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Ledford v. Sullivan, 105 F.3d 354, 356 (7th Cir. 1997) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984)).

## C. DISCUSSION

Arns, Ross and HRLLC (collectively the "Hubbard Action Defendants") seek dismissal of Counts I (declaratory judgment of copyright ownership), II (rescission), III and IV (commercial disparagement). We treat each of these arguments in turn.

### 1. Copyright Ownership (Count I)

The Hubbard Action Defendants contend that the Plaintiffs have failed to join a necessary and indispensable party. Consequently, they ask us to dismiss the request for declaratory judgment as to copyright ownership in Count I of the Amended Complaint.

Rule 19(a) of the Federal Rules of Civil Procedure requires the joinder of parties where

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. Rule 19(a). If such a person has not been joined to the lawsuit, the court must order that the person be joined. See id. If that person cannot be joined, the court must determine "whether in equity and good conscience" the action should proceed or be dismissed. Fed. R. Civ. P. Rule 19(b).

Application of Rule 19(a) in copyright cases requires a "careful weighing of practical and equitable considerations," rather than a formalistic approach. 7 Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1614. Where declaratory judgments are requested, the analysis is flexible. See, e.g., Caldwell Mfg. Co. v. Unique Balance Co., 18 F.R.D. 258, 260 n.2 (stating that "the flexibility inherent in the declaratory procedure indicates that there may be times when the court will be able to proceed without prejudicing the rights of absentees, although the same result would be more difficult to reach under stricter procedures").

In the instant case, the Hubbard Action Plaintiffs have asked us to declare and adjudge the rights of the parties as to three issues. Specifically, they seek judicial determinations that: (1) the AIE Documents were created as works for hire[1] and are the property of DHS; (2) any oral permission granted by DHS to Hubbard to use the AIE Documents could not be transferred or sub-licensed to any other party; and (3) the Buyout Agreement did not transfer any copyrightable interest in the AIE Documents

---

[1] The statutory definition of a "work made for hire" is "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101.

to the Defendants. Furthermore, the Plaintiffs seek to enjoin the Defendants from asserting any ownership interests in the AIE Documents and interfering with other parties' use of the Documents, as well as any other relief that this Court deems just and proper.

Defendants assert that these declarations cannot be made without joining an entity called the AXA Group. According to Defendants, the AXA Group is located in Paris, France, and is beyond the reach of this Court.[2] Defendants insist that AXA Group is a joint author of the AIE Documents and as such is a necessary and indispensable party. In support of this contention, Defendants rely on characterizations from Plaintiffs' original Complaint. Such reliance is improper, however, because the Amended Complaint supersedes all previous complaints. See Massey v. Helman, 196 F.3d 727, 735 (7th Cir. 2000) (stating that "when a plaintiff files an amended complaint, the new complaint supersedes all previous complaints and controls the case from that point forward"). Accordingly, we must disregard the references to AXA Group in the original Complaint.

The Amended Complaint makes only two references to the events leading to the creation of the AIE Documents. The Complaint describes how "[d]uring [Hubbard's] employment with DHS, individually and in concert with the employees

---

[2] Plaintiffs do not dispute this representation, so we accept it as true for purposes of this motion.

of those clients, Hubbard and co-workers developed and produced certain programs and methods which were described in written materials authored by Hubbard and others in their capacity as employees of DHS or its clients." (Amd. Compl. ¶ 10.) In the next paragraph the Complaint continues, "Each of the foregoing written publications was developed, written and produced by Hubbard and other employees of DHS and/or other clients of DHS and constituted 'works for hire' and were and are the intellectual property of DHS." (Id. ¶ 11.) Defendants submit that these references to "clients" indicate that the clients participated in the creation of the AIE Documents. Accordingly, Defendants maintain that Plaintiffs have alleged joint authorship of the Documents which requires joinder of the joint authors.

We disagree with Defendants' characterization of the allegations. While Plaintiffs do refer twice to "clients," the Amended Complaint does not allege that those clients participated in the drafting of the documents at any meaningful level. The first reference says merely that Hubbard and others drafted the documents as employees of DHS clients. Far from situating the clients as joint authors, this statement indicates that Hubbard created the documents <u>for</u> clients -- which sounds like a work made for hire, not a joint authorship. Defendants fare negligibly better with the second reference, because it at least suggests client participation in developing the Documents. The statement is equivocal, however, in that it leaves

open the question of whether the documents were created by employees alone, clients alone, or employees and clients. At this preliminary stage, Plaintiffs have adequately alleged the existence of a work made for hire. Their oblique references to clients does not defeat that allegation. Since they have not pleaded joint authorship, the purported joint author is not a necessary party.

Furthermore, even if we later determined that the AXA Group participated so extensively in the creation of the documents that they were effectively joint authors and the Documents are not "works made for hire," we could nonetheless make the determinations Plaintiffs seek without joining AXA Group. That is, we could still assess the validity of any oral permissions or licenses granted by DHS to Hubbard, as well as any transfers or sub-licenses. Each joint author acquires an undivided interest in the entire work and has the right to use the work as he or she pleases. See Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998). Thus, a joint author has the right to license the joint work to third parties without the other joint author's approval and is only accountable to the other joint author for profits flowing from the license. See id. Applying these rules to the instant situation, we need not broach the issue of AXA Group's approval of any purported licenses or transfer of licenses in order to resolve their validity. Accordingly, we anticipate being able to afford complete relief among those already parties without having to join AXA Group. See Fed. R. Civ. P. 19(a)(1).

Furthermore, our disposition of this matter would not as a practical matter impair or impede AXA's ability to protect whatever interest they may or may not have. See Fed. R. Civ. P. 19(a)(2)(i). All Plaintiffs have asked us to do is declare and adjudge whether the Documents are "works for hire." If they are, then AXA never had a protectable interest. If they are not, then AXA may very well have an interest in the Documents, but our inquiry will not extend that far. Rather, we shall limit ourselves to answering in the affirmative or the negative whether the Documents are "works for hire."

Assuming arguendo that AXA Group were a necessary party, they are not an indispensable party. According to the Seventh Circuit, an important consideration under Rule 19(b) is

> the availability or unavailability of an alternative forum. If the plaintiff's complaint is dismissed and there is no other court having jurisdiction over the parties as well as over the absent person, the plaintiff's interest in having the federal forum would strongly influence a court to find that the absent person was not indispensable.

Pasco Int'l (London) Ltd. v. Stenograph Corp., 637 F.2d 496, 500 (7th Cir. 1980). Federal courts have exclusive jurisdiction over copyright claims. See 28 U.S.C. § 1338(a). Thus no court in the United States could assert jurisdiction over AXA Group, and Defendants would effectively be immunized from suit. This would be a highly inequitable result.

We therefore conclude that the AXA Group is not a necessary party. Even if it were, it is not an indispensable party. Accordingly, Count I survives the motion to dismiss.

### 2. Rescission of the Buyout Agreement (Count II)

In Count II of the Amended Complaint, Hubbard seeks rescission of the Buyout Agreement. In support of this claim Hubbard offers two reasons: first, the mutual mistake of fact of the parties as to Hubbard's interest in the AIE Documents, and second, the failure of Hubbard, Arns and Ross to agree on the terms of and execute an Operating Agreement which was a condition precedent to the Buyout Agreement. Defendants counter that the claim should be dismissed because (1) Hubbard neglected his duty to Defendants to ensure he owned what he was selling, thus defeating mutual mistake, (2) rescission would require returning the other party to the status quo, which is impossible in this case, and (3) the Operating Agreement was not a condition precedent to the Buyout Agreement.

A mutual mistake of fact is a mistake "not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in . . . belief in the present existence of a thing material to the contract which does not exist. . . ." Cameron v. Bogusz, 711 N.E.2d 1194, 1197 (Ill. App. 1999). In order to state a claim for mutual mistake of fact, Hubbard must allege that: (1) a mistake was made in a

material feature of the contract; (2) enforcement of the contract would be unconscionable; (3) the mistake occurred despite Hubbard's exercise of due care; and (4) the Defendants could be placed in the position they were in prior to entering the contract. See Keller v. State Farm Ins. Co., 536 N.E.2d 194, 200 (Ill. App. 1989).

The Amended Complaint states a claim for rescission based on mutual mistake of fact. Hubbard alleges that he, Arns and Ross mistakenly believed that Hubbard had an ownership interest in the AIE Documents. Such a mistake is plausible, since the pleadings reveal that the parties drafted the Buyout Agreement without the assistance of counsel. (Amd. Compl. ¶ 14.) Furthermore, Hubbard alleges that his belief was "sincerely held." (Amd. Compl. ¶ 19.) Defendants may later rebut these allegations by showing, for instance, a failure to exercise due care and/or the impossibility of placing Ross, Arns and HRLLC where they were prior to entering the Buyout Agreement. Such rebuttals, however, are factual issues not suitable for our review at this early stage of the proceedings. See, e.g., Resolution Trust Corp. v. The State Bank of Woodstock, No. 90 C 1748, 1992 WL 201986, at *1 (N.D. Ill. Aug. 14, 1992) (observing that restoration of the status quo is "hardly a matter to determine on a motion to dismiss").

Thus Hubbard's action for rescission based on mutual mistake of fact withstands Defendants' motion to dismiss. Consequently, we need not address the alternate ground pertaining to the Operating Agreement.

### 3. Statutory and Common Law Disparagement (Counts III & IV)

Cogniplex and Hubbard also ask us to dismiss Counts III and IV of the Amended Complaint. Count III asserts a violation of section 510/2 of the Illinois Uniform Deceptive Trade Practice Act ("IUDTPA"), and Count IV raises a claim of common law disparagement. The IUDTPA substantially codifies the common law tort of commercial disparagement. See Allcare, Inc. v. Bork, 531 N.E.2d 1033, 1037 (Ill. App. 1988).

In order to state a claim for commercial disparagement, the Copyright Plaintiffs must allege that Defendants made a statement impugning the quality of Plaintiffs' services. See id. (citing Crinkley v. Dow Jones & Co., 385 N.E.2d 714 (Ill. App. 1978); American Pet Motels, Inc. v. Chicago Veterinary Med. Assoc., 435 N.E.2d 1297 (Ill. App. 1982) (abrogated on other grounds in Kuwik v. Starmark Star Marketing and Admin., Inc., 619 N.E.2d 129, 133 (Ill. 1993)). Statements that merely disparage the Plaintiff's integrity, rather than the quality of its services, are insufficient to support a claim of commercial disparagement. See id.

In <u>Crinkley</u>, the Illinois appellate court held that a statement that the plaintiff had bribed officials of foreign governments did not disparage the plaintiff's services and warrant injunctive relief under the IUDTPA. <u>See</u> 385 N.E.2d at 877. Although the statement may have implied that plaintiff lacked integrity, it did not disparage the quality of his business services. <u>See</u> <u>id.</u> Accordingly, the trial court properly dismissed the claim for failure to state a cause of action. <u>See</u> <u>id.</u> Similarly, in <u>American Pet Motels</u>, the Illinois appellate court held that a statement accusing a pet boarding service of the unlicensed practice of veterinary medicine did not constitute commercial disparagement because it did not convey that the service's business practices were substandard, negligent or harmful. <u>See</u> 435 N.E.2d at 1302-03.

In light of these cases, Plaintiffs have not stated a claim for commercial disparagement. Defendants merely stated that Plaintiffs were using the AIE Documents without a proper license or authorization. Such a statement may impugn Defendants' character and integrity, but it does not implicate the quality of Defendants' business practices. <u>American Pet Motels</u> is especially useful on this point, as it involved an allegation of lack of proper licensure. In the absence of allegations pertaining to the quality of the service itself -- that the service is substandard, negligent, or harmful, for example -- a mere allegation of unauthorized

use is not actionable as commercial disparagement. We therefore dismiss Counts III and IV of the Hubbard Action Plaintiffs' Amended Complaint.

## II. *THE ARNS ACTION (00 C 7933)*

### A. *BACKGROUND*

Arns, Ross and HRLLC (the "Arns Action Plaintiffs") brought an action against Hubbard, Cogniplex, and Hubbard Decision, Inc. (the "Arns Action Defendants") alleging violations of federal and state securities laws and other claims. Defendants have moved to dismiss several counts of the Complaint. For purposes of their motion we accept the following allegations as true, as we are obligated to do.

Arns and Ross maintained offices at Chicago Research and Planning Group ("CRPG"). CRPG specialized in creating a network of computer product vendors and corporate Chief Information Officers (collectively the "CRPG members"). The network facilitated marketing and sales among the vendors and CIOs.

In December 1998, Hubbard approached Arns and Ross with several proposals. First, he invited Arns and Ross to invest in a company to exploit Hubbard's AIE Methodology, which is a unique means of assessing the value of investing in information technology. Second, he wanted Arns and Ross to refer CRPG members as additional potential investors in Hubbard's proposed company. Third, Hubbard sought introductions from Arns and Ross to CRPG members to whom he could market

the AIE Methodology. Fourth, he believed Arns and Ross could direct him to consulting opportunities, as Hubbard had just separated from his employer.

In February 1999, Hubbard again approached Arns and Ross. This time he proposed that he, Arns and Ross form a limited liability company ("LLC") to improve and market the AIE Methodology. Hubbard planned to sell the AIE Methodology directly to Arns and Ross, who would then pass the Methodology on to HRLLC. Furthermore, Hubbard would contribute to the Company prospective patents, copyrights, and trade names as well as his existing revenue, prospects, customers and prospective revenue from the AIE Methodology. In turns, Arns and Ross would provide the financing. Each contributed $16,000 for a total of $32,000 due in several installments over the course of the upcoming year. Hubbard, Arns and Ross would be equal one-third owners of the new company, and Hubbard would manage it.

On or about March 26, 1999, the HRLLC was officially formed as an Illinois limited liability company. The parties never agreed on or executed an Operating Agreement, however. Despite the lack of an Operating Agreement, the company began business with Hubbard operating the company and Arns and Ross providing the capital.

From the company's inception until August 2000, Hubbard retained complete control of the business from his home in Glen Ellyn, Illinois. Despite Arns' and Ross'

efforts to become more involved in the business, they felt left "in the dark." They were "isolated from the business, operations and financial affairs of the Company." Hubbard failed to apprise Arns and Ross of the Company's business performance, clients, projects and income. In addition, Hubbard neglected the Company's books.

Shortly after Arns and Ross made their final installment payment of their start-up capital in March 2000, Hubbard expressed his dissatisfaction with the equal business ownership agreement and announced he would not complete his obligation to train Arns and Ross in the AIE Methodology. Eventually he issued an ultimatum demanding at least a 50% interest in HRLLC. If Arns and Ross did not agree, Hubbard said he would abandon HRLLC, decimate its business, take the Methodology and improvements with him, and begin competing directly against the Company. The following month, Hubbard increased the demand to at least a 66% interest in the Company.

In June 2000, Hubbard issued a final ultimatum. When Arns and Ross failed to accept his terms, Hubbard "disassociated" himself from the Company and took the Methodology with him. After the disassociation, Arns and Ross gained partial access to those books and records that Hubbard left behind. They discovered a litany of alleged abuses by Hubbard, including: failure to record the Plaintiffs' capital contributions; several loans made by Hubbard to himself; diversion of Company

proceeds to Hubbard; Hubbard's performance of clandestine consulting services; and conversion of the Methodology to Hubbard's own use.

In light of these and other alleged abuses, Arns and Ross brought this twelve-count Complaint against the Arns Action Defendants. Counts I and II allege violations of sections 12(1) and 12(2) of the '33 Act respectively. Count III claims a violation of section 10(b) of the '34 Act and Rule 10b-5. Counts IV and V assert violations of sections 5 and 12 of the Illinois securities laws. Count VI alleges a violation Illinois Limited Liability Company Act. Count VII alleges breach of fiduciary duty. Count VIII asserts breach of contract. Count IX alleges conversion. Count X raises a claim of breach of duty of loyalty. Count XI alleges common law fraud, while Count XII asks for an accounting. The Arns Action Defendants ask us to dismiss Counts I, II, III, IV and V.

### B. DISCUSSION

#### 1. Definition of Investment Contract (Counts II, III & V)

In their Complaint, Plaintiffs claim that Defendants violated section 12(2) of the '33 Act (Count II), Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 (Count III), and section 12 of the Illinois Securities Laws (Count V). Each of these claims is premised upon the existence of "securities" as defined by federal and state law. Defendants claim that no such securities existed.

The federal and state securities laws apply only to the purchase or sale of "securities" as defined therein. Both federal and state laws include "investment contracts" as types of securities. See 15 U.S.C. § 77b; 815 ILCS 5/2.1 In SEC v. W.J. Howey Co., the Supreme Court provided a framework for determining when investment contracts are subject to federal securities law. 320 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Under the Howey test, agreements are investment contracts (and therefore securities) if they reflect (1) an investment of money (2) in a common enterprise (3) with profits to come solely from the efforts of others. See id. at 301, 66 S.Ct. 1100. Because Illinois' securities laws substantially track federal securities laws, Illinois courts have adopted the Howey test. See Ronnett v. American Breeding Herds, Inc., 464 N.E.2d 1201, 1203 (Ill. App. 1984).

The Supreme Court has rejected formulaic application of the Howey test. Instead, the test "is to be applied in light of 'the substance – the economic realities of the transaction – rather than the names that may have been employed by the parties.'" Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 558, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979) (quoting United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 851-52, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)). In applying this test, we remember that one of the principal purposes underlying the federal securities laws is to "protect investors by promoting full disclosure of information necessary to informed investment

decisions." Bailey v. J.W.K. Properties, Inc., 904 F.2d 918, 921 (4th Cir. 1990). Because it is impossible to identify with precision each case in which investors need these protections, the definition of an investment contract must be a flexible, rather than static, principle. See id.

Flexibility is especially warranted in the context of limited liability companies ("LLCs"). LLCs are business entities that incorporate certain beneficial aspects of a partnership with certain beneficial aspects of a corporation. See 79 A.L.R. 5th 689 (2000). Properly structured, LLCs can combine corporate-styled liability shields and pass-through tax benefits of partnerships. See id. They can also boast an increased flexibility in financial structuring and governance procedure. See Comment, "Should Interests in Limited Liability Companies Be Deemed Securites?: The Resurgence of Economic Reality In Investment Contract Analysis," 44 Emory L.J. 1591, 1591 (1995). Owners can "set up management of the entity as they please." Welle, "Limited Liability Company Interests As Securities: An Analysis of Federal and State Actions Against Limited Liability Companies Under the Securities Laws," 73 Denv. U. L. Rev. 425, 446 (1996). In sum, LLCs provide "almost total freedom regarding the rights and duties of investor/members, allowing LLC interests to take on whatever attributes the promoter desires." Comment, 44 Emory L.J. at 1595.

Of all of the possible business structures, LLCs appear to be the most resistant to formulaic application of the Howey test. If an LLC is very closely held and member-managed, where each member is financially sophisticated and participates actively in the venture, the LLC interest is probably not a security under the Howey test. See 79 A.L.R. 5th 698. Not all LLCs are so tightly structured, however. Some LLCs may resemble a corporation or limited partnership where investors are passive participants. See id. LLC organizational structures therefore defy formulaic application of the Howey test. Instead, whether an LLC is a security under the Howey test depends on the particular facts and circumstances of the particular investment arrangement.

The instant dispute turns on whether the Plaintiff investors expected profits to be derived "solely from the efforts of a promoter or a third party." Howey, 328 U.S. 298-99. Although the United States Supreme Court has expressly reserved judgment on whether "solely" should be interpreted literally, the Court omitted the term "solely" in a subsequent formulation of the Howey test. See United Hous. Found., Inc. v. Forman, 421 U.S. 837, 852 n.16 (1975). This omission, coupled with the Court's consistent reminders to evaluate transactions in light of economic realities, suggests the appropriateness of conducting a liberal and flexible application of this prong of the Howey test. See Rivanna Trawlers Unltd. v. Thompson Trawlers, Inc., 840 F.2d 236,

240 (4th Cir. 1988) (stating that "solely" must not be given a literal construction in all circumstances); <u>Williamson v. Tucker</u>, 645 F.2d 404, 424 (5th Cir. 1981) (finding that even if investor retains some managerial control, can still establish "investment contract" by showing such dependence on promoter that investor lacked meaningful managerial powers).

Despite these governing principles, Defendants appear to have chosen form over substance in their contention that the membership interests are not investment contracts. Pointing out the parties' inability to agree on the terms of and execute an Operating Agreement, Defendants claim that the Illinois Limited Liability Company Act ("ILLCA") governs. Under the ILLCA, in a company without an operating agreement each member has equal rights in the management and control of the company's business. From this Defendants conclude that Plaintiffs must have had equal control and accordingly did not have investment contracts.

We decline to impose the strictures of the ILLCA upon the case before us, however, because by doing so we would flout the Supreme Court's command to conduct thoughtful inquiries into the economic realities of situations on a case-by-case basis. Indeed, in the absence of an Operating Agreement, we look to the particulars of the instant situation, rather than invoke generalized default provisions.

From the Amended Complaint (our only indicator of economic reality at this stage), we can discern a business relationship in which Hubbard assumed substantial, even complete, control over the Company -- and, as a corollary, its profits. The Amended Complaint describes how Hubbard operated the Company while Arns and Ross provided the capital as investors. Due to Arns' & Ross' lack of experience with the materials that Hubbard introduced to the business, Hubbard had to train Arns and Ross on the new system. Apparently all of the money came from Arns and Ross, but the business activity was generated and controlled by Hubbard. Arns and Ross sensed their "exclusion" from the Company's daily business activities. Taken together, these allegations suggest that the economic reality at HRLLC was that Hubbard controlled the business activities while Arns and Ross remained passive investors. Consequently, we believe Plaintiffs have alleged facts sufficient to support the conclusion that the membership interests constituted investment contracts that are securities for purposes of federal and state law. Our perception of this economic reality may change, of course, as each side develops facts that round out the picture. For now, however, Plaintiffs may go forward with their securities claims in Counts II, III and V of their Complaint.

### 2. Registration Claims (Counts I & IV)

The Arns Action Defendants also ask us to dismiss Counts I and IV of the Complaint because the membership interests are exempt from registration under

federal and state securities laws. Section 4(2) of the Securities Act of 1933 exempts from its registration and prospectus requirements those transactions by an issuer that do not involve any public offering. See 15 U.S.C. § 77(d)(2). This provision is commonly referred to as the "private offering exemption." According to the Supreme Court, the availability of the private offering exemption turns on whether the particular class of persons affected needs the protection of the Act. See SEC v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 985.

In Ralston Purina, the Supreme Court decided whether Ralston Purina's offerings of treasury stock to its "key employees" fell within the "private offering" exemption of section 4(1) of the '33 Act. See id. at 121. Ralston Purina had circulated among its employees an offer to sell stock to those who took the initiative. See id. Among the employees who responded were an artist, bakeshop foreman, chow loading foreman, clerical assistant, copywriter, electrician, stock clerk, mill office clerk, order credit trainee, production trainee, stenographer, and veterinarian. See id. Ralston Purina argued that these employees fell within the "private offering" exemption because, as "key employees" singled out by management, the employees "carrie[d] some special responsibility" and were "likely to be promoted to a greater responsibility." Id.

The Supreme Court held that the offering was public, not private. According to the Court, application of section 4(1) turns on whether the particular class of

persons affected need the protection of the Act. See id. at 125. Because the employees did not have access to the kind of information which registration would disclose, they deserved the protections of the securities laws. See id. at 127. According to the Court, the "obvious opportunities for pressure and imposition make it advisable that they be entitled to compliance with s[ection] 5." Id.

Following Ralston Purina, courts have relied on four guideposts in analyzing whether an offering is public or private: (1) the number of offerees and their relationship to the issuer; (2) the number of units offered; (3) the size of the offering; and (4) the manner of the offering. See SEC v. Continental Tobacco Co. of South Carolina, Inc., 463 F.2d 137, 159 (5th Cir. 1972); Johnston v. Bumba, 764 F. Supp. 1263, 1273 (N.D. Ill. 1991). The determination of whether a particular transaction involves a public offering is a question of fact necessitating a consideration of all surrounding circumstances. Hill York Corp. v. American Int'l Franchises, Inc., 448 F.2d 680, 687 (5th Cir. 1971); Johnston, 764 F. Supp. at 1274. The party claiming the private offering exemption has the burden of proof as to the exempt character of the transaction. See Van Dyke v. Coburn Enters., 873 F.2d 1094, 1097 (8th Cir. 1989).

Because the public/private offering determination requires a careful analysis of all facts and surrounding circumstances, dismissal of Plaintiffs' claim is inappropriate at this time. It is not clear to us as a matter of law that Arns and Ross did not need the protections of the Act. Instead, we think it prudent to allow discovery to go forward

so that we may conduct the intensive factual analysis warranted under the case law. After all, the burden rests with Hubbard to show that the transaction falls within the private offering exemption. He may well be able to show that Arns and Hubbard were sophisticated investors who did not need the protections of the securities laws, by pointing to specific facts relevant to Arns and Ross' investment experience, the nature of the relationship between Hubbard, Arns and Ross, and how Hubbard extended the offer to Arns and Ross. At this juncture, however, dismissing the claim would be premature because we cannot perform the requisite weighing of various fact-bound factors. Accordingly, the federal registration claim (Count I) survives Defendants' motion to dismiss.

Not so with the state registration claim, however. Illinois law exempts from the registration requirement any offer, sale or issuance of a security,

> whether to residents or to non-residents of this State, where:
>
> (a) all sales of such security to residents of this State (including the most recent such sale) within the immediately preceding 12-month period have been made to not more than 35 persons or have involved an aggregate sales price of not more than $1,000,000;
>
> (b) such security is not offered or sold by means of any general advertising or general solicitation in this State; and
>
> (c) no commission, discount, or other remuneration exceeding 20% of the sale price of such security, if sold to a resident of this State, is paid or given directly or indirectly for or on account of such sales.

815 ILCS 5/4. In the case at bar, The securities were offered only to the two Plaintiffs and involved well below $1,000,000. Furthermore, no general advertising or

solicitation occurred. Last, Hubbard received no commission for the sales. Thus, the case at bar satisfies all of these elements as a matter of law.

In their brief, Plaintiffs do not attempt to dispute the clear application of the Illinois exemption provision to the case at bar. Instead, they raise the unfounded assertion that "[t]he very nature of the [allegedly] fraudulent sales removes the transaction from the [federal and state] exemptions." (Pl. Brf. at 10.) Plaintiffs' fraud claims may be actionable under other state and federal provisions, but they will not save the registration claim from dismissal given the plain language of the Illinois exemption provision. Accordingly, Count IV is dismissed.

### 3. Breach of Contract Claim (Count VIII)

The Ross Plaintiffs claim that the formation of HRLLC created a contract among Ross, Arns and Hubbard which Hubbard breached. The Ross Defendants protest that the formation of an LLC cannot comprise a contract. They assert that the relationship among members without an Operating Agreement is not a contractual one. In support of this contention, they point to the absence of such a statement in the ILLCA.

Given the relatively recent advent of the LLC in Illinois, few courts have had an opportunity to examine the legal issues surrounding this new business form. No court has spoken on the issue presently before us. The only statutory provision we

found that has direct bearing on this contract issue pertains to actions brought by members. It provides that:

> A member may maintain an action against a limited liability company or another member for legal or equitable relief, with or without an accounting as to the company's business, to enforce all of the following: (1) The member's rights under the operating agreement. (2) The member's rights under this Act. (3) The rights and otherwise protect the interests of the member, including rights and interests arising independently of the member's relationship to the company.

805 ILCS 180/15-20. This provision exhibits a degree of permissiveness in affording members the opportunity to sue. Though it may not be directly on point, its permissiveness suggests that the instant allegation of breach of contract would not offend the spirit of the ILLCA. Our task would, of course, be far easier had the parties persevered and executed an Operating Agreement. Absent this beacon, we are left to conclude at this preliminary stage that Plaintiffs have stated a claim for breach of contract, in light of the permissive statutory rules about actions by members.

The general spirit of the ILLCA supports our preliminary conclusion. LLCs have substantial operating flexibility. See "The Illinois Limited Liability Company Act," 81 Illinois Bar Journal 352, 352 (July 1993). As we have previously discussed, LLCs have both corporate and partnership characteristics. Whether the relations among members resemble a partnership more than a corporation, or vice-versa, is left largely to the discretion of the individual organizers. This fluidity can complicate basic questions such as whether members have contracted with each other.

Co-shareholders are, after all, not contractually bound to each other unless express contracts exist such as a voting trust. Partnerships, by contrast, bind partners to each other in a contract of mutual agency. Whichever principle applies to the instant situation depends on how the parties structured their organization. We have little indication of this at this early stage of the proceedings. Consequently, this area requires further exploration in discovery to elicit the nature of the organizational structure. Dismissal at this time is unwarranted.

## III. CONCLUSION

For the foregoing reasons, we grant in part and deny in part both motions to dismiss. In <u>Cogniplex, Inc. v. Hubbard Ross L.L.C.</u> (00 C 7463), we grant the motion to dismiss Counts III and IV (statutory and common law commercial disparagement), and we deny the motion to dismiss Counts I (copyright declaration) and II (rescission) of the Amended Complaint. Furthermore, in <u>Arns v. Hubbard</u> (00 C 7933), we grant the motion to dismiss Count IV (Section 5 of Illinois Securities Laws – Registration Requirement) and deny the motion to dismiss Counts I, II, III, V and VIII.

Charles P. Kocoras
United States District Judge

Dated: _____ April 26, 2001 _____